IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JARVEY JACOBS, JR.,
      Plaintiff,

vs.                                   Case No.:  3:11cv520/LAC/EMT

WALTER GIELOW, et al.,
      Defendants.
_____/

## ORDER and REPORT AND RECOMMENDATION

Plaintiff Jarvey Jacobs, Jr. ("Plaintiff"), an inmate, proceeds pro se and in forma pauperis in this action brought pursuant to 42 U.S.C. § 1983.  Plaintiff sues Lieutenant Walter Gielow ("Gielow"), Sergeant Jefferson Davis ("Davis"), and Correctional Officer Kyle Hall ("Hall"), all of whom are correctional officers employed by the Florida Department of Corrections ("FDOC") at Santa Rosa Correctional Institution ("SRCI").  Presently before the court is the motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by Defendants (doc. 123), to which Plaintiff has responded in opposition (doc. 143).  Also before the court are Plaintiff's Motion to Strike the Declaration of Defendant Kyle Hall (doc. 141) and Motion for Sanctions (doc. 157).  Defendants oppose both motions (doc. 164).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C), and Fed. R. Civ. P. 72(b).  For the reasons set forth below, Plaintiff's pending motion to strike and motion for sanctions (docs. 141, 157) will be denied. Additionally, the court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

I.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff initiated this action on October 23, 2011, by filing a civil rights complaint under § 1983 (doc. 1).  His Second Amended Complaint (doc. 58), which is the operative pleading, alleges

that on November 29, 2010, Defendant Gielow was deliberately indifferent to his risk of suicide, Defendant Hall used excessive force by "forcefully" removing Plaintiff's clothing while he was awaiting medical treatment for a self-inflicted wound, and Defendants Davis and Hall used excessive force by beating him while he awaited medical treatment, all in violation of the Eighth Amendment (*id.* at 6–11).[1]  Suing Defendants in their individual capacities (*see id.* at 1), Plaintiff seeks declaratory relief; punitive, compensatory, and nominal damages; and costs and attorney's fees (*id.*). Defendants argue they are entitled to summary judgment because Plaintiff cannot establish a constitutional violation against any Defendant, and they are entitled to qualified immunity (doc. 123 at 19–40).  Defendants submitted evidence in support of their arguments (doc. 123, Exhibits).  The undersigned issued an order on April 4, 2013, informing the parties of the importance and ramifications of summary judgment consideration and providing them with information as to the requirements for materials submitted for review pursuant to Rule 56 (doc. 128).  Plaintiff responded in opposition to Defendants' motion for summary judgment and submitted evidence in support of his position (doc. 136; doc. 143-2, Exhibits).  Plaintiff also filed a motion to strike one of Defendant's documentary submissions, and a motion for sanctions (docs. 141, 157).  Defendants responded in opposition to these motions (doc. 164).  The parties' motions are now ripe for review.

II.    PLAINTIFF'S MOTION TO STRIKE AND MOTION FOR SANCTIONS

Prior to addressing Defendants' motion for summary judgment, the court must first consider Plaintiff's motion to strike and motion for sanctions (docs. 141, 157).  In Plaintiff's motion to strike, he argues that the Declaration of Kyle Hall, submitted by Defendants in support of their motion for summary judgment (doc. 123-9, Ex. L, Declaration of Kyle Hall), should be stricken, pursuant to Rule 11(b)(4) of the Federal Rules of Civil Procedure.  As grounds for striking Hall's declaration, Plaintiff argues Hall's declaration includes an untruthful statement that he (Hall) and Defendant Davis were the only persons present in the B-dormitory sally port on November 29, 2010, when Hall and Davis used force upon Plaintiff (doc. 141 at 1, Exs. A, B).  Plaintiff requests that the court strike Hall's declaration and grant summary judgment in favor of Plaintiff (doc. 141 at 1).

---

[1]  The page numbers in this Report and Recommendation are the numbers assigned by the court's electronic docketing system, rather than the page numbers or exhibit references the parties may have designated.

In Plaintiff's motion for sanctions, filed under Rule 11(b), (c), he argues Defendants and their counsel should be sanctioned for making the following four false statements in their submissions to the court:

> (1)      Defendant Hall's statement which is the subject of Plaintiff's motion to strike, discussed *supra*,
>
> (2)      Defendants' statement in their Answer to the complaint that Defendant Davis previously worked in "D-Dorm, the mental health dorm,"
>
> (3)      Defendants' statement in their Answer that Plaintiff did not suffer a physical injury, and
>
> (4)      Defendants' statement in their Answer that Plaintiff's injuries were self-inflicted.

(doc. 157 at 1–2).  Plaintiff states he notified Defendants on August 26, 2013, that he would file a motion for sanctions if the "lies" were not corrected within twenty-one (21) days, but Defendants failed to correct them (*id.* at 2–3, 4–6).  Plaintiff requests that the court sanction Defendants and their counsel by initiating criminal charges against them and dismissing their motion for summary judgment (*id.* at 3).

Rule 11, the authority relied upon by Plaintiff in his motions, provides in relevant part:

> **(b) Representations to the Court.**  By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > **(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > **(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> >
> > **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

**(4)** the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

**(c) Sanctions.**

**(1) In General.**  If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.  Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

**(2) Motion for Sanctions.**  A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.  If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.
. . . .
**(4) Nature of a Sanction.**  A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated.  The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11(b), (c).  Applying these standards, the court will address each of the four grounds for sanctions asserted in Plaintiff's motions.

1.    Hall's Declaration

Plaintiff states Defendant Hall's declaration, submitted in support of Defendants' motion for summary judgment, includes an untruthful statement that he (Hall) and Defendant Davis were the only persons present in the B-dormitory sally port on November 29, 2010, when Hall and Davis used force upon Plaintiff (doc. 141 at 1; doc. 157 at 1 (referencing doc. 123-9, Ex. L)).  Plaintiff states Hall's statement is contradicted by the sworn statement of Officer Joshua Nowling, who stated he was present in the B-dormitory sally port when the use of force occurred (doc. 141 at 1; doc. 157 at 1–2 (referencing doc. 123-1, Ex. B at 26; doc. 123-2, Ex. C at 3)).

The context of Hall's allegedly false statement in his declaration is the following:

> While I do not recall everything that happened that morning, I do remember that I did not have handcuffs in my hand. I had the ligature cutters, which I would have either handed off to another officer or placed in my pocket before assisting in restraining Jacobs. Sergeant Davis was the only other officer in the immediate area when Jacobs began attempting to assault me, and he immediately responded by attempting to restrain Jacobs. Therefore, I must have put the ligature cutters in my pocket.

(doc. 123-9, Ex. L, Declaration of Kyle Hall ¶ 6). Defendants' summary judgment materials also include a statement by Officer Joshua Nowling that he was "present in the sally-port of B-dormitory" when Plaintiff threatened to spit in Hall's face and turned toward Hall in an aggressive manner, and he witnessed the use of force (doc. 123-1, Ex. B at 26; doc. 123-2, Ex. C at 3).

Officer Nowling's statement that he was in the sally port does not demonstrate the falsity of Hall's statement that Davis was the only other officer "in the immediate area." The fact that Nowling was in the sally port does not suggest he was within arm's reach of Hall, which is what the context of Hall's statement suggests he meant by "immediate area." Therefore, Plaintiff failed to show a violation of Rule 11(b). Further, Defendants filed Nowling's statement at the same time they filed Hall's declaration, thus clarifying who was present during the use of force. This was done well before Plaintiff notified Defendants of his intent to seek sanctions and, following Plaintiff's notification, Defendants did not need to withdraw or correct any of their statements because (as previously explained) none were misstatements. Therefore, sanctions are not warranted.

2. <u>Defendants' statement in their Answer that Defendant Davis previously worked in "D-Dorm, the mental health dorm"</u>

Plaintiff contends Defendants falsely stated in their Answer that D-dormitory is the inpatient mental health dormitory at SRCI (doc. 157 at 2 (referencing doc. 78 at 4)). Plaintiff states that the inpatient mental health dormitory is actually Q-dormitory, and he submitted a sworn declaration stating such in his response to Defendants' motion for summary judgment (doc. 143, Ex. OO, Declaration of Jarvey Jacobs, Jr. ¶ 1).

Defendants' exact statement in their Answer is, "Admit that Defendant Davis was previously assigned to D-Dorm, which is the mental health dorm." (doc. 78, Answer ¶ V. 10. d.). However, Defendants corrected this misstatement in their summary judgment materials filed well before Plaintiff

notified them of his intent to seek sanctions.  In their summary judgment materials, Defendants submitted a sworn declaration of Defendant Davis stating he had previously worked in "Q dormitory, which houses inmates receiving mental health treatment" (doc. 123-10, Declaration of Jefferson Davis ¶ 3).  In light of Defendants' correction of the misstatement regarding which dormitory was the "mental health dormitory," which in any event is a nonmaterial fact, sanctions are not appropriate.

      3.    <u>Defendants' statement in their Answer that Plaintiff did not suffer a physical injury</u>

Plaintiff contends Defendants stated in their Answer that Plaintiff did not suffer a physical injury, yet in their motion for summary judgment they state Plaintiff suffered "de minimis" physical injury (doc. 157 at 2 (referencing doc. 78, Defenses and Affirmative Defenses ¶ 1. and doc. 123 at 28, 31, 33)).

Defendants' statement in their answer is the following, "Plaintiff did not suffer a physical injury and is therefore not entitled to compensatory or punitive damages under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e)." (doc. 78, Defenses and Affirmative Defenses ¶ 1.).  In their motion for summary judgment, Defendants argue Plaintiff's injuries from the use of force by Defendants Hall and Davis were *de minimis*, and they specifically identify and document those injuries as a laceration, a swollen knot, bruises to his right arm, and bruises and lacerations to his face (doc. 123 at 28–29, 31, 33, 38–39).

Defendants' stated defense, that Plaintiff was not entitled to compensatory or punitive damages under 42 U.S.C. § 1997e(e) because he did not suffer a physical injury, is not inconsistent with their argument that he suffered only *de minimis* physical injury as a result of the use of force by Defendants Hall and Davis, nor is it an unwarranted defense under existing law.  The physical injury requirement of § 1997e(e) is not satisfied unless the physical injuries are greater than *de minimis*.  *See* <u>Mitchell v. Brown & Williamson Tobacco Corp.</u>, 294 F.3d 1309, 1312–13 (11th Cir. 2002).  Additionally, Defendants subsequently clarified their position in their motion for summary judgment, arguing hat Plaintiff suffered only *de minimis* physical injury and therefore was not entitled to compensatory or punitive damages (doc. 123 at 28–29, 31, 38–39).  No Rule 11 violation occurred; therefore, sanctions are not appropriate on this ground.

      4.    <u>Defendants' statement in their Answer that Plaintiff's injuries were self-inflicted</u>

Plaintiff contends Defendants "lied" to the court by stating in their Answer that Plaintiff's injuries were self-inflicted, yet in their motion for summary judgment they admitted he suffered other injuries, and the only self-inflicted wound was to his left arm (doc. 157 at 2 (referencing doc. 78, Defenses and Affirmative Defenses ¶ 3)).

Defendants' statement in their answer is the following, "Plaintiff's injuries are self inflicted, for which Defendants Gielow, Davis, and Hall are not responsible." (doc. 78, Defenses and Affirmative Defenses ¶ 1.). As previously noted, in the motion for summary judgment, Defendants argue Plaintiff's injuries from the use of force by Defendants Hall and Davis were *de minimis*, and they argue they are not liable for any self-inflicted injury suffered by Plaintiff (doc. 123 at 22–25, 28–29, 31, 33, 38–39). Plaintiff failed to demonstrate that Defendants' legal and factual contentions in their Answer were unwarranted by existing case law, or lacking in evidentiary support. Therefore, he failed to demonstrate a violation of Rule 11.

To summarize, Plaintiff failed to demonstrate that sanctions are appropriate for any of the alleged Rule 11 violations described in his motion to strike and motion for sanctions. Therefore, the motions will be denied.

## III.   MATERIAL FACTS FOR PURPOSES OF SUMMARY JUDGMENT

As this case comes before the court on Defendants' motion for summary judgment, the court views the facts in the light most favorable to Plaintiff, the non-moving party, *see* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. *See* Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

With regard to the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.**   A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if Defendants' motion and supporting materials—including the facts considered undisputed—show that Defendants are entitled to it. *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

Any facts included in Defendants' statement of material facts that are not controverted in Plaintiff's response are deemed admitted. *See* N.D. Fla. Loc. R. 56.1(A) (all material facts set forth in moving party's statement of undisputed material facts will be deemed admitted unless controverted by statement required to be filed and served by opposing party). Additionally, the court notes that some the events at issue were captured by fixed wing video cameras and a hand held video camera operated by a non-Defendant correctional officer. The digital videos from the cameras are part of the record (doc. 123, Exs. A, D, F).[2] The facts presented here are viewed in the light depicted by the videos to the extent those facts are captured on camera. *See* Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) (stating that when a videotape of an incident is part of the record, the court should view the facts in the light depicted by the videotape).

Applying these standards, the court conveys the following as the material facts.[3] On November 2, 2010, Plaintiff was released from Q-dormitory, the inpatient mental health dormitory, to a single-man cell in B-dormitory as a "Close Management I" inmate (doc. 143-2, Ex. OO, Declaration of Jarvey Jacobs, Jr. ¶ 1). Close Management is the confinement of an inmate apart from the general

---

[2] The court granted Defendants' unopposed motion to file the digital videos under seal (docs. 124, 125).

[3] The court has slightly supplemented Defendants' statement of the undisputed facts with some additional information taken from the cited sources.

population "for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others." *See* Fla. Admin. Code r. 33-601.800(1)(d) (2010). There are three individual levels associated with close management, CMI, CMII, and CMIII, with CMI being the most restrictive single cell housing level. *Id.*, r. 33-601.800(1)(e), (2)(a).

On November 29, 2010, at approximately 7:02 a.m., Defendant Davis, who was the Close Management Housing Sergeant in B-dormitory, entered Wing 3 of B-dormitory and walked to Plaintiff's cell, B3105, where he remained for approximately one minute (doc. 123, Defendants' Statement of Material and Genuine Facts at 6; doc. 123-1, Ex. A ("Fixed Wing Video of Plaintiff's Cell"); doc. 123-10, Declaration of Jefferson Davis, ¶¶ 2, 4). Davis states he observed Plaintiff yelling and kicking on his cell door (Davis Decl. ¶ 4). Plaintiff denies he was yelling or kicking his cell door (doc. 143, Plaintiff's Statement of the Disputed Facts at 2; Jacobs Decl. ¶ 3). Plaintiff states Davis asked him, "What's the problem?" and Plaintiff responded that he was declaring a psychological emergency (Jacobs Decl. ¶ 3). Plaintiff states Davis responded that he would notify Defendant Gielow (*id.*). Davis notified Gielow, who was the Close Management Housing Lieutenant in B-dormitory, that Plaintiff was creating a disturbance (Defendants' Statement of Material and Genuine Facts at 6; Davis Decl. ¶ 4; doc. 123-11, Ex. N, Declaration of Walter Gielow, ¶ 3). At approximately 7:05 a.m., Gielow and Davis entered B-dormitory and walked to Plaintiff's cell (Defendants' Statement of Material and Genuine Facts at 6; Fixed Wing Video of Plaintiff's Cell; Davis Decl. ¶ 4; Gielow Decl. ¶ 3). Gielow attempted to counsel with Plaintiff to cease his disruptive behavior, but Gielow and Davis state Plaintiff continued to yell and kick his cell door (Davis Decl. ¶ 4; Gielow Decl. ¶ 3). Plaintiff states he told Gielow he was declaring a psychological emergency because he was "feeling suicidal," but Gielow refused to contact the mental health department and instead told him, "Go lay down or I'm going to use chemical agents" (doc. 58, Second Amended Complaint at 6; Plaintiff's Statement of the Disputed Facts at 2; Jacobs Decl. ¶ 3).[4] Gielow states he

---

[4] Plaintiff signed his complaint under penalty of perjury. Therefore, the factual allegations in the complaint may be used as an opposing affidavit. *See* Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986); *see also* 28 U.S.C. § 1746 (setting forth requirements for unsworn declarations under penalty of perjury). To function as an opposing affidavit, a complaint must be based on personal knowledge and set forth specific facts admissible in evidence. Fed. R. Civ. P. 56(c); Perry, *supra*. Accordingly, the court considers those portions of Plaintiff's complaint

could not understand what Plaintiff was saying while he was yelling (Gielow Decl. ¶ 3). Gielow and Davis deny that Plaintiff stated he was suicidal or declared a psychological emergency at that time (Davis Decl. ¶ 4; Gielow Decl. ¶ 3). Davis and Gielow left Plaintiff's cell at approximately 7:06 a.m. (Fixed Wing Video of Plaintiff's Cell). Gielow returned to his office and informed the Warden and the medical department of the situation to obtain approval to utilize chemical agents (Defendants' Statement of Material and Genuine Facts at 6; Davis Decl. ¶ 4; Gielow Decl. ¶ 3; Plaintiff's Statement of the Disputed Facts at 2). Davis returned to Plaintiff's cell approximately six (6) minutes later, at 7:12 a.m., and remained there until 7:13 a.m. (Defendants' Statement of Material and Genuine Facts at 6; Fixed Wing Video of Plaintiff's Cell).

During the 3-minute period that followed, Plaintiff attempted suicide by cutting his left arm (Second Amended Complaint at 6; Plaintiff's Statement of the Disputed Facts at 2). Other inmates kicked their cell doors to draw the attention of officers (*id.*). At approximately 7:16 a.m., Davis, Gielow, and Officer Travis Beaver, who was operating a handheld video camera in the event it was necessary to use force upon Plaintiff, entered B-dormitory and proceeded to Plaintiff's cell (Defendants' Statement of Material and Genuine Facts at 6; Fixed Wing Video of Plaintiff's Cell; Davis Decl. ¶ 5; Gielow Decl. ¶ 3). Gielow gave Plaintiff a final order to cease his disorderly behavior or chemical agents would be applied (Defendants' Statement of Material and Genuine Facts at 6–7; Gielow Decl. ¶ 3; Second Amended Complaint at 7; Plaintiff's Statement of the Disputed Facts at 2; Jacobs Decl. ¶ 4). At that time, Davis and Gielow saw that Plaintiff had cut his left arm, and it was bleeding (Defendants' Statement of Material and Genuine Facts at 7; Davis Decl. ¶ 5; Gielow Decl. ¶ 3; Plaintiff's Statement of the Disputed Facts at 2). Plaintiff told Gielow he was declaring a psychological emergency (Defendants' Statement of Material and Genuine Facts at 7; Davis Decl. ¶ 5; Gielow Decl. ¶ 3). Gielow immediately contacted the officer's station on the radio to summon the medical staff to respond to Plaintiff's self-inflicted injury (*id.*).

---

that meet the personal knowledge and specificity requirements as part of Plaintiff's opposition to the motion for summary judgment. *See also* Moulds v. Bullard, 345 F. App'x 387, 391 (11th Cir. 2009) ("[S]pecific facts pled in a sworn complaint must be considered in opposition to summary judgment.") (citing Perry); Shaw v. Cowart, 300 F. App'x 640, 645 (11th Cir. 2008) ("Facts alleged by the plaintiff in a sworn pleading" must be considered in opposition to summary judgment).

Gielow states that at approximately 7:18 a.m., he instructed Plaintiff to remove his clothing, but Plaintiff did not comply (Gielow Decl. ¶ 4). Plaintiff disputes that Gielow directed him to remove his clothing (Plaintiff's Statement of the Disputed Facts at 3; Jacobs Decl. ¶ 4). It is standard practice in the FDOC to remove an inmate's clothing if he has intentionally injured himself or stated that he intends to hurt himself (Defendants' Statement of Material and Genuine Facts at 7; Gielow Decl. ¶ 4). The reason for this practice is to prevent the inmate from concealing any weapons or other instruments he may use to hurt himself and to prevent him from hanging himself with his clothing (*id.*). Gielow states that when an inmate's clothing is removed, it is standard practice to provide the inmate a "privacy shroud," which in B-dormitory was a non-tearable piece of orange fabric, slightly smaller than a bath towel, that is wrapped around the inmate's waist and long enough to cover most of his thighs (Gielow Decl. ¶ 4).

At approximately 7:18 a.m., Plaintiff submitted to wrist restraints, and was removed from his cell and escorted to the B-dormitory sally port to await medical staff (Defendants' Statement of Material and Genuine Facts at 7; Fixed Wing Video of Plaintiff's Cell; Davis Decl. ¶ 5; Gielow Decl. ¶ 4; Plaintiff's Statement of the Disputed Facts at 3). No blood is visible on Plaintiff's clothing at the time he exited his cell, but only Plaintiff's back is visible on the fixed wing video, and it is visible for only six (6) seconds (Jacobs Dec. ¶ 4; Fixed Wing Video of Plaintiff's Cell). Upon arrival in the sally port at approximately 7:20 a.m., Gielow states he again instructed Plaintiff to remove his clothing, but Plaintiff refused (Defendants' Statement of Material and Genuine Facts at 7; Gielow Decl. ¶ 4). Plaintiff disputes that Gielow ever ordered him to remove his clothing (Plaintiff's Statement of the Disputed Facts at 3; Jacobs Decl. ¶ 4). Gielow then made a closing statement for the handheld video and ordered Officer Beaver to cease operating the handheld video camera, as no force had been used (including the application of chemical agents), because Plaintiff had complied with orders to cease disruptive behavior, was willingly removed from his cell, and was awaiting medical treatment (Defendants' Statement of Material and Genuine Facts at 7; Gielow Decl. ¶ 5; Davis Decl. ¶ 6; Plaintiff's Statement of the Disputed Facts at 3; Jacobs Decl. ¶ 4).[5]

---

[5] The FDOC administrative rules provide, "A video recording is not required if, during the same shift, the inmate ceases the conduct creating the disturbance while the shift supervisor and camera operator are present with a camera but resumes such conduct after the shift supervisor and camera operator have departed the area prior to an

Defendant Hall began assisting Davis and Gielow in the sally port at approximately 7:24 a.m. (Defendants' Statement of Material and Genuine Facts at 7; doc. 123-9, Ex. L, Declaration of Kyle Hall ¶ 3). They were awaiting medical staff so they could transport Plaintiff to the medical triage room, because medical staff had the key to the triage room (Hall Decl. ¶ 3). At approximately 7:26 a.m., Gielow retrieved an orange privacy shroud (doc. 123-1, Ex. F ("Fixed Wing Video of Medical Triage Room")). Gielow ordered Hall to use ligature cutters to cut Plaintiff's clothing off (*id.*). By that time, Plaintiff's clothing was contaminated with blood from his self-inflicted wound (Defendants' Statement of Material and Genuine Facts at 7; Hall Decl. ¶ 3). Hall cut off Plaintiff's clothing (Hall Decl. ¶ 3; Davis Decl. ¶ 6). Gielow, Hall, and Davis positioned Plaintiff facing the wall, which is standard practice when a close management inmate is out of his cell, because it provides extra security in case an inmate attempts to break free or attack an officer (Defendants' Statement of Material and Genuine Facts at 7; Davis Decl. ¶ 6, Hall Decl. ¶ 3). The officers shielded Plaintiff with a privacy shroud to maintain Plaintiff's privacy while Hall removed his clothing, and then they wrapped the shroud around Plaintiff's waist (Defendants' Statement of Material and Genuine Facts at 8; Davis Decl. ¶ 6, Hall Decl. ¶ 3). Plaintiff disputes that Defendants used a privacy shield, and states he was standing naked, handcuffed behind his back with his "privates" exposed (Plaintiff's Statement of the Disputed Facts at 3; Jacobs Decl. ¶ 4). Gielow asked Plaintiff what he had used to cut himself, but Plaintiff refused to tell him (Gielow Decl. ¶ 5). Gielow left the sally port to return to Plaintiff's cell to look for the object, but he did not find it (Defendants' Statement of Material and Genuine Facts at 7; Gielow Decl. ¶ 5; Hall Dec. ¶ 3; Davis Decl. ¶ 6). Plaintiff admitted in his deposition that he used a "regular size" staple to cut his arm, and he flushed the staple down the toilet in his cell prior to the time Davis, Gielow, and Officer Beaver came to his cell (doc. 123-40, Ex. QQ, Deposition of Jarvey Jacobs).

Davis states Plaintiff became impatient and agitated, asking Hall and Davis what was taking so long and why medical staff had not shown up yet (Davis Decl. ¶ 7). Plaintiff states at no time did he become argumentative with Hall and Davis in the sally port (Plaintiff's Statement of the Disputed Facts at 21). Davis told Plaintiff to calm down and try to be patient, and assured him that a medical

---

application of chemical agents." *See* Fla. Admin. Code r. 33-602.210(8)(n)2.e. (2010).

staff member would be there soon (*id.*). Davis and Hall state that at approximately 7:27 a.m., Plaintiff became argumentative and increasingly agitated (Defendants' Statement of Material and Genuine Facts at 8; Davis Decl. ¶ 7, Hall Decl. ¶ 4). Again, Plaintiff denies he became argumentative (Plaintiff's Statement of the Disputed Facts at 21). Davis and Hall utilized force against Plaintiff, taking him to the ground on his back and then rolling him over onto his stomach (Davis Decl. ¶ 7; Hall Dec. ¶ 4). Davis and Hall state they applied force in response to Plaintiff's threatening to spit on Hall and then attempting to do so by clearing his throat and turning his head toward Hall (*id.*). Plaintiff admits he threatened to spit on Hall, but states he did not do so until after Hall and Davis utilized force (Jacobs Decl. ¶ 6). Additionally, Plaintiff denies he ever cleared his throat or turned his head in an attempt to spit (*id.*).

The parties also dispute what occurred during the use of force. Davis and Hall state Davis maintained his custodial hold of Plaintiff's right upper arm with his left hand, and placed his right hand on Plaintiff's upper left torso, and then utilized backward pressure to place Plaintiff onto the floor in a face up position (Defendants' Statement of Material and Genuine Facts at 8; Davis Decl. ¶ 7; Hall Decl. ¶ 4). They state Plaintiff was taken down in a face-up position because Plaintiff, Davis, and Hall were standing next to a wall (Defendants' Statement of Material and Genuine Facts at 8; Hall Decl. ¶ 4). Davis and Hall state that once on the floor, Davis then rolled Plaintiff into a face-down position and maintained pressure on his head, which was turned slightly away from Davis so that Plaintiff's left eye and the left side of his forehead would be pressed to the ground, so that Plaintiff would not be able to spit at them until a spit shield could be retrieved (Defendants' Statement of Material and Genuine Facts at 8; Davis Decl. ¶ 7; Hall Decl. ¶ 4). Davis and Hall state that during this time, Hall positioned his hands and, at times, his left knee on Plaintiff's upper back, and placed his left hand on the back of Plaintiff's head, so that Plaintiff would not be able to spit (Defendants' Statement of Material and Genuine Facts at 8; Davis Decl. ¶ 7). Davis and Hall state Plaintiff continued to resist and struggle, on and off, attempting to move or pick up his head and upper body (Davis Decl. ¶ 7; Hall Decl. ¶ 4).

Plaintiff's version of the use of force is very different. He states after Hall placed the privacy shroud on him, Hall punched him in the back of the head with an object, causing his head to bleed (Plaintiff's Statement of the Disputed Facts at 3; Jacobs Decl. ¶ 4). Plaintiff states he did not provoke

Hall's conduct, nor had he threatened or attempted to spit on anyone at that time (Second Amended Complaint at 8; Plaintiff's Statement of the Disputed Facts at 7; Jacobs Decl. ¶ 4). Plaintiff states Davis then violently threw him down on the floor and punched him in his lower back, kidney area, and right arm, which caused bruising (Plaintiff's Statement of the Disputed Facts at 3; Jacobs Decl. ¶ 4). Plaintiff states Hall jumped down on the floor and began punching him in the face, choking him, and putting pressure on his right eye (Jacobs Decl. ¶ 5). Plaintiff states Hall and Davis were calling him names, such as "punk," "queer," and "faggot" while they beat him (Plaintiff's Statement of the Disputed Facts at 4). Plaintiff states at that time he threatened to spit unless they stopped hitting him, but he never cleared his throat, turned his head, or attempted to spit (Jacobs Decl. ¶ 6).

At approximately 7:29 a.m., while Davis and Hall were restraining Plaintiff on the ground, Gielow returned to the sally port with Officer Beaver, and ordered Officer Nowling to retrieve the handheld video camera and begin filming (Defendants' Statement of Material and Genuine Facts at 8–9; Davis Decl. ¶ 8; Fixed Wing Video of Medical Triage Room). Nowling retrieved the camera and began recording at 7:29 a.m. according to the fixed wing video, which is indicated as 7:35 a.m. on the handheld camera; the video from the handheld camera thus indicates a time six (6) minutes later than the time indicated on the fixed wing video (Defendants' Statement of Material and Genuine Facts at 9; Fixed Wing Video of Medical Triage Room; Handheld Video).[6] Davis told Gielow that Plaintiff attempted to spit, and Gielow ordered that a spit shield be placed on Plaintiff (Davis Decl. ¶ 8; Hall Decl. ¶ 5). Hall placed the spit shield on Plaintiff while Davis maintained his left arm on the back of Plaintiff's neck, and his left knee on Plaintiff's back (Defendants' Statement of Material and Genuine Facts at 9; Davis Decl. ¶ 8; Hall Decl. ¶ 5; Fixed Wing Video of Medical Triage Room; doc. 123-1, Ex. D ("Handheld Video")). Officer Beaver placed leg restraints on Plaintiff (*id.*). Plaintiff was assisted to his feet at 7:30 a.m. (*id.*). At 7:32 a.m., Medical staff arrived and unlocked the medical triage room, and Davis and Hall escorted Plaintiff to the medical triage room (Defendants' Statement of Material and Genuine Facts at 9; Davis Decl. ¶ 8; Fixed Wing Video of Medical Triage Room; Handheld Video).

---

[6] For purposes of consistency and clarity, all references to time hereafter refer to "fixed wing video time," which is six (6) minutes earlier than the time indicated on the handheld video.

At approximately 7:33 a.m., Nurse Donahoo conducted a post use of force examination on Plaintiff (Defendants' Statement of Material and Genuine Facts at 9; Jacobs Decl. ¶ 7; Fixed Wing Video of Medical Triage Room; Handheld Video). Nurse Donahoo determined that Plaintiff had a self-inflicted cut to his left arm, scratches to his forehead, an abrasion to the back of his right arm, and a knot and cut to the back of his head (Defendants' Statement of Material and Genuine Facts at 9; doc. 123-1, Ex. B at 17–18, Emergency Room Record). Plaintiff states his injuries also included bruises, black eyes, and a concussion (Plaintiff's Statement of the Disputed Facts at 6; Jacobs Decl. ¶ 7). Photographs of Plaintiff's face and head taken three days after the incident verify Plaintiff's assertion that he suffered bruising of his left eye and the surrounding area (doc. 123-3, Photographs). Nurse Donahoo cleaned Plaintiff's injuries and treated them with Skintegrity wound cleanser, and applied gauze to Plaintiff's self-inflicted cut on his left arm (doc. 123-1, Ex. B at 17–18, Emergency Room Record). Nurse Donahoo referred Plaintiff to the infirmary in the event Plaintiff required stitches (*id.*).

After Nurse Donahoo completed her examination of Plaintiff, at approximately 7:45 a.m., Officer Melvin and Officer Beaver escorted Plaintiff to the emergency room at the main unit so that Plaintiff could receive further treatment (Defendants' Statement of Material and Genuine Facts at 9–10; Jacobs Decl. ¶ 7; Fixed Wing Video of Medical Triage Room; Handheld Video). At approximately 7:54 a.m., Advanced Registered Nurse Practitioner M. Nichols, examined Plaintiff and described his injuries as superficial cuts to his left forearm, abrasions and redness to his forehead, and a lump and abrasion to the back of his head (Defendants' Statement of Material and Genuine Facts at 10; doc. 123-8, Ex. K at 1, Inpatient History/Physical). Plaintiff complained of a headache, as well as dizziness and nausea (*id.*). ARNP Nichols treated the self-inflicted wound on Plaintiff's arm with Steri Strips and examined and cleaned the wound to the back of his head (Plaintiff's Statement of the Disputed Facts at 8; Defendants' Statement of Material and Genuine Facts at 10; Handheld Video). ARNP Nichols's notes state she ruled out a concussion (doc. 123-8, Ex. K at 1, Inpatient History/Physical).[7]

---

[7] Nichols's notes state "R/O concussion" (doc. 123-6, Ex. I at 1). The court takes judicial notice that "R/O" is the generally accepted medical abbreviation for "rule out." *See* Fed. R. Evid. 201; United States v. Berrojo, 628 F.3d 368, 369 (5th Cir. 1980) ("The doctrine of judicial notice permits a judge to consider a generally accepted or readily

At approximately 8:07 a.m., Senior Behavioral Analyst Kimbra Gill, Ph.D., interviewed Plaintiff, and determined that he should be placed in the infirmary for observation (Defendants' Statement of Material and Genuine Facts at 10; doc. 123-1, Ex. H at 2–3, IMR Clinical Record—Initial Evaluation; Handheld Video). Dr. Gill noted that the medical department confirmed that Plaintiff vomited while in the emergency room, and medical was completing neurological checks every fifteen (15) minutes due to concern that he may have suffered a concussion (Ex. H at 2, IMR Clinical Record—Initial Evaluation). After Dr. Gill completed her interview, at approximately 8:13 a.m., Officer Beaver and Officer Melvin escorted Plaintiff from the emergency room to cell #I2102 (Defendants' Statement of Material and Genuine Facts at 10; Handheld Video). Plaintiff was provided a green shroud (Second Amended Complaint at 8, 10; Handheld Video). At approximately 8:17 a.m., Defendant Gielow addressed the handheld video camera with a brief closing statement (Defendants' Statement of Material and Genuine Facts at 10; Handheld Video).[8]

At 8:45 a.m., Dr. Galleja, M.D. formally admitted Plaintiff to the infirmary on Self Harm Observation Status ("SHOS"), and authorized Plaintiff to have a blanket and the shroud (Defendants' Statement of Material and Genuine Facts at 10; Jacobs Decl. ¶ 7; doc. 123-6, Ex. I at 1, Physician's Order Sheet). At 12:40 p.m., Plaintiff was examined by RN Specialist K. Gardner, who described Plaintiff's injuries as bruising from the midline forehead to the front of his left eye, swelling on the back of Plaintiff's head the size of a 50-cent piece, and a laceration on his left forearm covered with a large band-aid (doc. 123-13, Ex. P at 2). Plaintiff complained of a headache, nausea when sitting or standing, and blurred vision in his left eye (*id.*). Gardner noted Plaintiff was alert and oriented, his pupils were equal and reactive to light, no dilation was noted, no abnormal speech pattern was noted, and Plaintiff's memory was intact (*id.*). At 1:30 p.m., ARNP Nichols prescribed Tylenol for

---

verified fact as proved without requiring evidence to establish it.").

[8] Defendants admit that the video of the events that occurred at Plaintiff's cell from 7:16–7:20 a.m. recorded by Officer Beaver prior to the use of force in the sally port no longer exists (*see* doc. 138 ¶ 3; doc. 143-2, Ex. LL, Defendant Gielow, Davis, and Hall's Answer and Objection to "Plaintiff's 3rd Request for Production of the Handheld DDVD Disc, Dated 11/29/2010"). Documents show that Officer Nowling gave the B-dormitory video recorder to Gielow at 8:30 a.m. on November 29, 2010 (doc. 123-1, Ex. B at 4). Major J. Peters received the video recorder from Gielow and placed it in the security hallway lockbox at 3:00 p.m. on November 29, 2010 (*id.*). Major Peters attempted to view the pre-use of force video on December 2, 1010, but it was no longer on the video recorder (*id.* at 19).

pain and ordered neurological checks every two (2) hours for twelve (12) hours (doc. 123-6, Ex. I at 1, Physician's Order Sheet). Plaintiff remained on SHOS until December 3, 2010, when he was discharged to security (Defendants' Statement of Material and Genuine Facts at 10; Plaintiff's Statement of the Disputed Facts at 8).

III. LEGAL STANDARDS

A. Summary Judgment Standard

In order to prevail on their motion for summary judgment, Defendants must show that Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986). If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate

specific facts showing that there is a genuine issue for trial); <u>Hammer v. Slater</u>, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Plaintiff in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. *See* <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); <u>Jones v. Cannon</u>, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, Plaintiff still bears the burden of coming forward with sufficient evidence of every element that he must prove. *See* <u>Celotex Corp.</u>, 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp.</u>, 477 U.S. at 322.

    B.    <u>Eighth Amendment</u>

In <u>Hudson v. McMillian</u>, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992), the Supreme Court delineated the two standards for an Eighth Amendment claim.[9] Claims of excessive force by prison officials fall under the Eighth Amendment's proscription against cruel and unusual punishment. The standard applied to Eighth Amendment claims has a subjective and an objective component. As to the objective component, "not every malevolent touch by a prison guard gives rise to a federal cause of action." <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37, 130 S. Ct. 1175, 1178 (2010) (citing <u>Hudson</u>, 503 U.S. at 9). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. <u>Hudson</u>, 503 at 9 (quoting <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" <u>Hudson</u>, 503 U.S. at 10 (citation omitted). Accordingly, the Eleventh Circuit requires that the plaintiff suffer more than a *de minimis* injury to establish an Eighth Amendment violation, although courts must remain mindful of the fact that a significant injury is not required. *See* <u>Johnson v. Breeden</u>, 280 F.3d 1308, 1321 (11th Cir. 2002).

---

[9] Plaintiff brings all of his claims under the Eighth Amendment (Second Amended Complaint at 6–11; doc. 123-2, Memorandum of Law).

Under the subjective component, to sustain an Eighth Amendment challenge it must be shown that prison officials' actions amounted to an "unnecessary and wanton infliction of pain." <u>Whitley v. Albers</u>, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084, 89 L. Ed. 2d 251 (1986). "Force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting <u>Whitley</u>, 475 U.S. at 320–21). In determining whether an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including these five: "the need for the application of force; the relationship between that need and the amount of force used; the extent of the threat to the safety of staff and inmates, as reasonably perceived by officials; the extent of injury; and any efforts made to temper the severity of the response." <u>Hudson</u>, 503 U.S. at 7–8; *see also* <u>Whitley</u>, 475 U.S. at 321; <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1375 (11th Cir. 1999). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." <u>Whitley</u>, 475 U.S. at 321 (quoting <u>Johnson</u>, 481 F.2d at 1033). Although the absence of serious injury is relevant to an excessive force claim, the core judicial inquiry is not whether a quantum of injury was sustained but rather whether force was applied in a good-faith effort to maintain or restore discipline or whether it was applied maliciously and sadistically to cause harm. *See* <u>Wilkins</u>, 559 U.S. at 37; *see also* <u>Hudson</u>, 503 U.S. at 4. Additionally, under Eleventh Circuit law, in cases in which a collective use of force is alleged, the court need not analyze separately the force administered by each officer to determine which of the blows or other acts, if any, constituted the use of excessive force. <u>Skrtich</u>, 280 F.3d. at 1302.

That officials followed prison regulations in administering force or restraint provides evidence that they acted in good faith and not to inflict pain. <u>Campbell</u>, 169 F.3d at 1376 (citation omitted). Thus, as summarized in <u>Campbell</u>, "[p]recedent dictates that [the determination whether defendants acted maliciously and sadistically for the very purpose of causing harm] be guided by the five <u>Hudson/Whitley</u> factors outlined above, by deference to prison officials' punitive judgments, and by this Court's previous holdings that compliance with prison policies evidences officials' good faith." *Id.*

The Court in <u>Whitley</u> narrowed the precise inquiry applicable when deciding whether officials are entitled to judgment as a matter of law:

> courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives.  Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

<u>Whitley</u>, 475 U.S. at 322 (emphasis added).

A "deliberate indifference" standard applies to claims concerning prison conditions and medical needs.  *See* <u>Hudson</u>, 503 U.S. at 5–6; <u>Sims v. Mashburn</u>, 25 F.3d 980, 984 (11th Cir. 1994). The Eighth Amendment requires that, at the minimum, all claims challenging conditions of confinement must demonstrate an infliction of pain "without any penological purpose" or an "unquestioned and serious deprivation of basic human needs" such as medical care, exercise, food, warmth, clothing, shelter, or safety.  <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981); *see also* <u>Hamm v. DeKalb Cnty.</u>, 774 F.2d 1567, 1571–72 (11th Cir. 1985).

Prisoners have the right "to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.</u>, 402 F.3d 1092, 1115 (11th Cir. 2005) (quoting <u>Belcher v. City of Foley, Ala.</u>, 30 F.3d 1390, 1396 (11th Cir. 1994)).  To establish liability for a prisoner's suicide, or attempted suicide, under section 1983, the plaintiff must show that the jail official displayed "deliberate indifference" to the prisoner's taking of his own life or attempting to do so.  *See* <u>Cook</u>, 402 F.3d at 1115 (internal quotation marks and citation omitted).  "[D]eliberate indifference requires that the defendant deliberately disregard 'a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.'" *Id.*  "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." <u>Tittle v. Jefferson Cnty. Comm'n</u>, 10 F.3d 1535, 1540 (11th Cir.1994) (en banc).  To be deliberately indifferent to a strong likelihood that the prisoner will commit suicide, the official must be subjectively aware that the combination of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates

a strong likelihood that the prisoner will commit suicide. *See* <u>Gish v. Thomas</u>, 516 F.3d 952, 954–55 (11th Cir. 2008).

C. <u>Qualified Immunity</u>

Qualified immunity protects government officials from liability for civil damages unless they violate a statutory or constitutional right that was clearly established at the time the alleged violation took place. *See* <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009); <u>Amnesty Int'l, USA v. Battle</u>, 559 F.3d 1170, 1184 (11th Cir. 2009). "The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted)). Qualified immunity is a defense not only from liability, but also from suit, so courts should ascertain the validity of a qualified immunity defense as early in the lawsuit as possible. *See id.*

"Under the well-defined qualified immunity framework, a 'public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" <u>Terrell v. Smith</u>, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting <u>Lee</u>, 284 F.3d at 1194). Once the official has done so, the burden shifts to the plaintiff to satisfy the following two-pronged inquiry: (1) whether the facts that a plaintiff has shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *See* <u>Pearson</u>, 555 U.S. at 232; *see also* <u>Lewis v. City of West Palm Beach</u>, 561 F.3d 1288, 1291 (11th Cir. 2009) (the plaintiff has the burden of showing that the official is not entitled to qualified immunity). In this case, there is no dispute that Defendants were acting in their discretionary capacities. The Supreme Court made clear in <u>Pearson</u> that a court need not employ a rigid two-step procedure, but rather may exercise its discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. at 236.

A constitutional violation may be clearly established either by similar prior precedent, or in rare cases of "obvious clarity." <u>Coffin v. Brandau</u>, 642 F.3d 999, 1013–14 (11th Cir. 2011). With either method, the touchstone is whether the right would be apparent to a reasonable officer. *Id.*

Under the first approach, the court looks only to binding precedent—holdings of cases drawn from the United States Supreme Court, the Eleventh Circuit, or the highest court of the state where the events took place. *See id.* at 1013; Amnesty Int'l, 559 F.3d at 1184. "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." Coffin, 642 F.3d at 1013. The qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)). An official's awareness of an abstract right "does not equate to knowledge that his conduct" may infringe that right. *Id.* at 1015 (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)). Further, "officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Id.*

"Obvious clarity" cases are "rare," Coffin, 642 F.3d at 1015, and present a "narrow exception" to the general rule of qualified immunity, Lee, 284 F.3d at 1199. These obvious clarity cases take two forms. Gilmore, 2013 WL 6698070, at *11. First, a broad statement of legal principle announced in case law may be sufficient if it establishes the law "'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002). Alternatively, obvious clarity is recognized if the conduct is "so bad that case law is not needed to establish that the conduct cannot be lawful." *Id.* at 1350.

V.     DISCUSSION

A.     Defendant Gielow's Alleged Deliberate Indifference to Suicide Risk

Plaintiff contends Gielow's failure to contact mental health staff and order an officer to constantly supervise him, upon his notifying Gielow he was suicidal, constituted deliberate indifference to a substantial risk that he would commit suicide or attempt to do so (Second Amended Complaint at 11; doc. 123 at 21; doc. 123-2, Memorandum of Law at 2).

The facts, viewed in the light most favorable to Plaintiff, show that when Davis and Gielow came to Plaintiff's cell at 7:05 a.m., Plaintiff told Gielow he was declaring a psychological emergency because he was "feeling suicidal." Gielow responded that he would not notify the mental health staff, and he instructed Plaintiff to lie down, or he would spray Plaintiff with chemical agents. Davis and Gielow left Plaintiff's cell at approximately 7:06 a.m. Davis returned to Plaintiff's cell at

approximately 7:12 a.m. and remained there until 7:13 a.m. Gielow and Davis then returned to Plaintiff's cell at 7:16 a.m., and observed that Plaintiff had cut his arm.

These facts fail to show that Gielow was subjectively aware that failing to immediately notify mental health staff and order constant supervision of Plaintiff created a strong likelihood, rather than a mere possibility, that Plaintiff would attempt suicide. Plaintiff states at 7:05 a.m., he told Gielow he was declaring a psychological emergency because he was "feeling suicidal," but he does not allege the existence of any other verbal or behavioral indicators suggesting a strong likelihood he would act on his feelings.[10] Further, although the evidence shows that <u>Davis</u> may have been aware of Plaintiff's history of self-harm,[11] there is no evidence <u>Gielow</u> possessed this knowledge. Additionally, the fixed wing video of Plaintiff's cell demonstrates that Gielow observed Plaintiff only eleven (11) minutes after Plaintiff informed Gielow and Davis he was "feeling suicidal," and during that 11-minute period, Davis returned to Plaintiff's cell and observed him for one (1) minute. These facts fail to show that Gielow was aware that Plaintiff had a serious medical need for constant supervision or immediate attention from mental health staff, or both, and that Gielow's failure to act was the result of deliberate indifference, as opposed to mere negligence. *See* <u>Cagle v. Sutherland</u>, 334 F.3d 980, 984, 989 (11th Cir. 2003) (jailer was not deliberately indifferent to a pre-trial detainee's risk of suicide when he jailer observed the detainee every fifteen (15) minutes, and the detainee had been stripped of his belt, shoelaces, the contents of his pockets, and all implements that could foreseeably be used by him to commit suicide).

Furthermore, Plaintiff failed to carry his burden of demonstrating that at the time of Gielow's conduct, November 29, 2010, the law clearly established that Gielow's conduct violated Plaintiff's Eighth Amendment rights. Plaintiff cites the following cases as clearly establishing his right to immediate attention from mental health officials and constant supervision in the meantime: <u>Osterback v. McDonough</u>, 549 F. Supp. 2d 1337 (M.D. Fla. 2008), <u>Viero v. Bulfano</u>, 925 F. Supp. 1374 (N.D.

---

[10] Plaintiff vehemently denies he was kicking on his cell door and yelling, and he denies he was upset because he was not permitted to participate in recreation (doc. 123 at 20).

[11] Davis stated in his declaration that he knew Plaintiff prior to November 29, 2010, because he (Davis) had previously worked as a supervisor in the dormitory which houses inmates receiving mental health treatment (Davis Decl. ¶ 3).

Ill. 1996), <u>Harvey v. Cnty. of Ward</u>, 32 F. Supp. 2d 1003 (D.N.D. 2005), and <u>Ginest v. Bd. of Cnty.</u>
<u>Comm'r of Carbon Cnty.</u>, 333 F. Supp. 2d 1190 (D. Wyo. 2004) (doc. 143-1, Memorandum of law
at 2, 3). However, none of these district court cases constitute binding precedent for purposes of
qualified immunity analysis, because they are not holdings of cases drawn from the United States
Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida.

The undersigned is aware of <u>Snow ex re. Snow v. City of Citronelle, AL</u>, 420 F.3d 1262 (11th
Cir. 2005), in which the Eleventh Circuit held that the following facts would establish an Eighth
Amendment claim that a correctional officer was deliberately indifferent to an inmate's risk of
suicide: (1) the defendant officer telephoned another correctional institution, and a jailor told him that
within the last month, the inmate had "given them a lot of trouble" and tried to cut her wrist; (2) the
defendant officer observed the inmate beat on her cell door, climb on the sink in her cell, charge at
the officer, beat on the cell window, and attempt to hit the officer; (3) the defendant officer told the
inmate's parents that the inmate was suicidal; (4) the defendant officer went off duty without
communicating to anyone else at the jail his belief that the inmate was a strong suicide risk; and (5)
despite the defendant officer's belief that the inmate was a strong suicide risk, the officer admitted he
did not monitor the inmate as if she were suicidal, which would have included visual checks every
fifteen (15) minutes and removal of items from her cell with which she could have harmed herself, nor
did officer return the inmate to the hospital from which she had been released into the police custody.
*Id.* at 1266–67, 1270.[12]

Unlike the circumstances in <u>Snow</u>, Plaintiff states he was not exhibiting any disruptive
behavior. Further, he was not left unmonitored—Davis returned to his Plaintiff's cell just six (6)
minutes after Plaintiff alerted Gielow and Davis he was "feeling suicidal," and then Gielow and Davis
returned to his cell just three (3) minutes after that. Therefore, <u>Snow</u> did not clearly establish that
Gielow's conduct violated Plaintiff's Eighth Amendment rights.

---

[12] There is other binding precedent establishing that certain facts would demonstrate deliberate indifference
to an inmate's risk of suicide, but those cases concern conduct of psychiatrists and other mental health officials, not
security staff. *See* <u>Greason v. Kemp</u>, 891 F.2d 829 (11th Cir. 1990); <u>Rogers v. Evans</u>, 792 F.2d 1052 (11th Cir. 1986).

Plaintiff failed to satisfy his burden of demonstrating Gielow is not entitled to qualified immunity on Plaintiff's claim of deliberate indifference to his suicide risk. Therefore, Gielow is entitled to qualified immunity and summary judgment in his favor.

B.     Defendant Hall's Removal of Plaintiff's Clothing

Plaintiff claims that Defendant Hall subjected him to cruel and unusual punishment, in violation of the Eighth Amendment, by removing his clothing, exposing his genitals and buttocks, and replacing his clothing with a "short pink revealing skirt" after Plaintiff exited his cell and was awaiting medical treatment for his self-inflicted wound (*see* doc. 58 at 7–8; doc. 123-1, Memorandum of Law at 4). Defendants contends Hall had a legitimate, penological reason for removing Plaintiff's clothing. Defendants submitted evidence, specifically, Gielow's declaration, that it is standard practice to remove an inmate's clothing if he has intentionally injured himself or stated he intends to hurt himself. The reason for this practice is to prevent the inmate from concealing any weapons or other instruments he may use to hurt himself and to prevent him from hanging himself with his clothing. Gielow's declaration also states that when an inmate's clothing is removed, it is standard practice to provide the inmate a "privacy shroud," which in B-dormitory was a non-tearable piece of orange fabric, slightly smaller than a bath towel, that is wrapped around the inmate's waist and long enough to cover most of his thighs.

Plaintiff argues security officers are not authorized to remove an inmate's clothing and replace it with a shroud without first receiving authorization from medical or mental health staff. In support of his position, he submitted his own diagram of two different shrouds, one depicts the shroud that Hall placed upon him, and the other depicts the shroud that Gielow provided Plaintiff after he had been placed on SHOS (doc. 143-2, Ex. EE-1). Plaintiff also submitted an informal grievance he submitted to the institutional health services administration, in which he inquired as follows:

> . . . [whether] security is authorized to forcefully remove an inmate's clothing and place a suicide shroud on an inmate without first getting authorization from medical and mental health to do this.

(doc. 143-2, Ex. PP). D. McGowan, whose position is "OMC II," responded:

> Before anyone is placed in an SHOS shroud, security requests authorization from medical and/or mental health. If the physician is here, the physician writes an order for such.

(*id.*). However, Plaintiff produced nothing to rebut Defendants' evidence that it is standard practice for security staff to remove an inmate's clothing if he has intentionally injured himself or states he intends to injure himself.

Plaintiff's submissions are insufficient to create a genuine issue of material fact as to whether Hall (the officer who removed the clothing) and Gielow (the officer who ordered Hall to remove the clothing) had a legitimate penological reason for removing Plaintiff's clothing. Plaintiff had just cut his arm with an object, which had not been identified or located by the officers. Further, although Plaintiff makes much of the fact that his clothing was not soiled with blood <u>at the time he exited his cell</u>, he does not dispute that <u>by the time he reached the sally port</u>, after being handcuffed and shackled, his clothing was soiled with the bodily fluid. Plaintiff's wearing the same clothing thus posed a risk to officer health and safety. Moreover, FDOC regulations provide that inmates in close management, which is where Plaintiff was housed, must be provided the same clothing as the general inmate population "unless there are facts to suggest that on an individual basis exceptions are necessary for the welfare of the inmate or the security of the institution." Fla. Admin. Code r. 33-601.800(10)(a). The regulations further provide that "[a]ny item may be removed from the cell in order to prevent the inmate from inflicting injury to him or herself or others . . . . If an inmate's clothing is removed, a modesty garment shall be immediately obtained and given to the inmate. . . . Under no circumstances shall an inmate be left without a means to cover him or herself." *Id.*

Additionally, the removal of Plaintiff's clothing was conducted in a reasonable and non-abusive manner. The removal of Plaintiff's clothing occurred in the sally port with only four or five correctional officers present. Plaintiff was facing the wall, and officers held up a privacy shroud at the time Hall removed Plaintiff's clothing Although Plaintiff disputes that officers used a privacy shield, he does not dispute he was facing the wall at the time, which not only shielded his frontal private area at least partially, but also would have interfered with his ability to observe and provide reliable testimony as to whether officers were shielding him from behind. Further, the handheld video refutes Plaintiff's allegation that Hall replaced Plaintiff's clothing with a "short pink revealing skirt," suggesting Hall intended to humiliate him. The video demonstrates that the shroud was an orange, FDOC-issued shroud, which was long enough to cover his genitals and buttocks. Further, Plaintiff's submissions demonstrate that use of the SHOS shroud, which required prior authorization from

medical staff, is different than the privacy shroud utilized by security staff to protect Plaintiff's privacy after removing his clothing for legitimate security reasons. Moreover, there is no evidence Plaintiff suffered any injury as a result of Hall's conduct, let alone injury that was objectively serious. *See* Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (prison official was entitled to summary judgment on prisoner's Eighth Amendment claim that official sexually harassed him by conducting unwarranted strip search, where prisoner produced nothing to rebut presumption of reasonableness which attaches to prison security regulations, including regulation that required officer to strip search all close management prisoners before they leave their cells); *see also, e.g.*, Moton v. Walker , — F. App'x —, No. 12-12256, 2013 WL 5911245, at *3 (11th Cir. Nov. 5, 2013) (unpublished) (even if officer lacked a legitimate penological purpose in conducting a strip search of plaintiff inmate and officer's alleged smile revealed a "subjectively culpable state of mind," there was no evidence that plaintiff suffered an objectively serious injury; therefore, officer was entitled to qualified immunity on plaintiff's Eighth Amendment claim).[13] Therefore, the facts viewed in Plaintiff's favor fail to establish a constitutional violation with respect to Hall's removal of Plaintiff's clothing.

Additionally, Plaintiff failed to carry his burden of demonstrating that at the time of Hall's conduct, the law clearly established that "forcefully" removing an inmate's clothing and replacing it with a privacy shroud, after the inmate had incurred a self-inflicted injury and was awaiting medical treatment, violated the Eighth Amendment. Plaintiff cites one case as clearly establishing an Eighth Amendment violation, Jones v. Huff, 789 F. Supp. 526 (N.D.N.Y. 1992) (doc. 143-1, Memorandum of Law at 2, 4). As previously discussed, a case from another district court is not binding precedent for purposes of qualified immunity analysis. Therefore, Plaintiff failed to carry his burden of demonstrating Hall is not entitled to qualified immunity on Plaintiff's Eighth Amendment claim regarding the removal of his clothing.

C.    Defendants Hall and Davis's Alleged Use of Excessive Force

As noted, whether an application of force was applied maliciously and sadistically to cause harm may be analyzed by application of several factors, including "the need for the application of

---

[13] The undersigned cites unpublished Eleventh Circuit cases only as persuasive authority and recognizes that the opinions are not considered binding precedent. *See* 11th Cir. R. 36-2.

Case No.: 3:11cv520/LAC/EMT

force; the relationship between that need and the amount of force used; the extent of the threat to the safety of staff and inmates, as reasonably perceived by officials; the extent of injury; and any efforts made to temper the severity of the response." Hudson, 503 U.S. at 7–8.

Defendants first assert that the extent of Plaintiff's injuries does not support the conclusion that force was applied maliciously and sadistically because the injuries are only *de minimis* in nature. The evidence supplied by Defendants shows that following the incident, Plaintiff's injuries were described as a self-inflicted cut to his left arm, scratches to his forehead, an abrasion to the back of his right arm, and a knot and cut to the back of his head. Defendants submitted a declaration of Olugbenga Ogunsanwo, a medical doctor employed as the Assistant Secretary for Health Services in the FDOC, who states he reviewed the use of force report, the post use of force medical examination, and subsequent medical treatment records for Plaintiff (doc. 123-12, Ex. O, Declaration of Olugbenga Ogunsanwo ¶ 1). Dr. Ogunsanwo states the injuries noted by medical staff are compatible with the manner of restraint described in the use of force report (which is the same as described in Defendants' declarations submitted in support of their motion for summary judgment) (*id.*, ¶ 4). Dr. Ogunsanwo states the injuries noted by medical staff are not consistent with Plaintiff's version of the use of force (*id.*, ¶ 5). According to Defendants, the *de minimis* injuries suffered by Plaintiff suggest the level of force used was not excessive.

In response, Plaintiff argues that his medical records and photographs of his injuries show he additionally suffered bruises, black eyes, and a concussion. The evidence supports Plaintiff's allegations only as to bruising of his left eye (a "black eye") and the surrounding area. Although there is evidence that medical staff monitored Plaintiff for a concussion, there is no evidence Plaintiff was diagnosed with a concussion; in fact ARNP Nichols's notes indicate she ruled out a concussion. Plaintiff also alleges that nearly two (2) years after the incident, he still suffers from nightmares and constant headaches, and has lost all sense of smell as a result of the blow to the back of his head (doc. 58 at 10). Plaintiff alleges he sought medical treatment for the headaches and loss of smell at the Reception and Medical Center, where he was housed in 2011, and he submitted copies of four inmate sick-call requests as evidence of his complaints, only one of which is readable (doc. 143 at 10–11; doc. 143-2, Ex. S). Plaintiff alleges he received CT scans, pain medication, and numerous examinations as a result of his complaints, and he states Senior Physician Delgado evaluated him on

several occasions (doc. 143 at 10–11). Plaintiff alleges Dr. Delgado determined that he lost his sense of smell as a result of the head injury and that this determination is documented in Plaintiff's medical records dated April 4, 2011 (*id.* at 11). However, Plaintiff did not submit any evidence to support the statements he attributes to Dr. Delgado, namely, Dr. Delgado's diagnosing or ordering treatment for the alleged continuing injuries (headaches and loss of sense of smell) and his attributing those injuries to the use of force on November 29, 2010. Therefore, Plaintiff failed to properly support his assertion that the headaches and loss of sense of smell he has suffered for the past two years are attributable to the use of force on November 29, 2010.

Plaintiff additionally argues that his self-inflicted wound should "count" in the determination of whether his injuries were *de minimis*. The "extent of injury" factor of the Hudson/Whitley analysis clearly refers to the injury resulting from the use of force. Here, there is no dispute that Plaintiff's self-inflicted wound did not result from the use of force by Hall and Davis and instead occurred 10–15 minutes prior to the use of force, when Plaintiff was alone in his cell. Therefore, Plaintiff's self-inflicted wound will not be considered in analyzing the "extent of injury" factor of the excessive force analysis. Absent consideration of the self-inflicted injury and the injuries for which Plaintiff failed to provide proper documentary support, the undersigned concludes Plaintiff failed to demonstrate a genuine issue of material fact as to whether the injuries he suffered from the use of force were more than *de minimis* in nature. Therefore, the "extent of injury" factor weighs in Defendants' favor. *See, e.g.,* Tate v. Rockford, 497 F. App'x 921, 925 (11th Cir. 2012) (noting that laceration on forehead, several small abrasions and cuts, and a swollen right eye—but no broken bones or additional injuries or permanent injury or debilitating pain—suggest *de minimis* injury); Ledlow v. Givens, 500 F. App'x 910, 914 (11th Cir. 2012) (finding that a bloody nose and a small laceration represented *de minimis* injury); Hall v. Leavins, No. 3:06cv351/RV/EMT, 2009 WL 2905912, *8 (N.D. Fla. Sept. 4, 2009) ("Hall suffered tenderness in his wrist, two superficial abrasions and a two-inch "knot" or hematoma on his forehead, and a bruise, two superficial abrasions, and some swelling to his leg. Hall required no medical treatment other than cleaning and dressing his abrasions. . . . [Hall] required [no] more than 'first aid' treatment."), *aff'd*, 403 F. App'x 479 (11th Cir. 2010).

Next, Defendants contend that Plaintiff threatened to spit in Defendant Hall's face and then turned, cleared his throat, and attempted to spit in Hall's face, which gave rise to the need for the

application of force, as he engaged in behavior that was a direct threat to commit a battery upon Hall. Defendants argue Plaintiff admitted in his deposition that he threatened to spit upon Hall, and his threat was intended to place Hall and Davis in fear of transmission of debilitating diseases such as herpes and hepatitis. Plaintiff admits he threatened to spit, but states he threatened to do so only <u>after</u> Hall and Davis utilized force, and he did so in an attempt to make them stop beating him. Additionally, Plaintiff denies he ever cleared his throat or turned his head in an attempt to spit. Thus, under Plaintiff's version of the incident, there was no need for the application of any force at all, beyond that which might routinely be needed to escort a compliant prisoner who was handcuffed and shackled, and awaiting medical treatment.

Viewing Defendants' and Plaintiff's conflicting evidence in the light most favorable to Plaintiff, as is proper at summary judgment, the court must accept Plaintiff's version of these facts: Plaintiff did not threaten to spit or attempt to do so prior to Defendants' use of force. Thus, the <u>Hudson/Whitley</u> "need for the application of force" factor weighs in Plaintiff's favor. Consequently, accepting for purposes of summary judgment that there was no need to apply force to control Plaintiff, the court must likewise conclude at this stage of the litigation that the remaining <u>Hudson/Whitley</u> factors—the relationship between the need to apply force and the amount of force used, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of the response—also favor Plaintiff.

In short, the evidence in this case goes beyond a mere dispute over the reasonableness of the force used by Defendants against Plaintiff on November 29, 2010. Rather, viewing the evidence in the light most favorable to Plaintiff, the court concludes that the evidence is sufficient to support "a reliable inference of wantonness in the infliction of pain." <u>Whitley</u>, 475 U.S. at 322. At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Anderson</u>, 477 U.S. at 255. Due to the existence of a genuine dispute over the material facts, deciding whether or not Defendants Hall and Davis employed excessive force would necessarily involve crediting one side's version of the incident over the other's. As this would encroach on the province of the jury, summary judgment in Defendants' favor is not appropriate. <i>See</i> <u>Rankin v. Klevenhagen</u>, 5 F.3d 103, 108 (5th Cir. 1993) (where excessive force claim by inmate turns on choosing between dueling but plausible

narratives by the plaintiff and defendant, disposition is "dependent on a fact-sensitive inquiry and credibility determinations" and "summary judgment is not a proper vehicle for the resolution of these disputed issues"). Further, in the Eleventh Circuit, the defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment. *See* Skrtich, 280 F.3d at 1301. The undersigned therefore recommends that Defendants' motion for summary judgment be denied as to Plaintiff's excessive force claim against Defendants Davis and Hall.

      D.     <u>Limitation on Recovery</u>

Defendants argue that, pursuant to 42 U.S.C. § 1997e(e), Plaintiff may not recover compensatory or punitive damages because, at most, Plaintiff's injuries were only *de minimis* in nature. Plaintiff alleges that nearly two years after the incident, he still suffers from nightmares and constant headaches, and has lost all sense of smell as a result of the blow to the back of his head (doc. 58 at 10).

Title 42 U.S.C. § 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The Eleventh Circuit has decided that the phrase "Federal civil actions" means all federal claims, including constitutional claims. <u>Napier v. Preslicka</u>, 314 F.3d 528, 532 (11th Cir. 2000) (citation omitted). Where a prisoner plaintiff alleges constitutional violations he is prevented under § 1997e(e) from seeking punitive or compensatory damages in the absence of a physical injury. <u>Smith v. Allen</u>, 502 F.3d 1255, 1271 (11th Cir. 2007) *abrogated on other grounds by* <u>Sossamon v. Texas</u>, ____U.S.____, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011)); *see also* <u>Al-Amin v. Smith</u>, 637 F.3d 1192, 1199 (11th Cir. 2011) (noting that <u>Napier</u> court, by affirming dismissal of Napier's entire claim, "concluded, albeit *sub silentio*, that Napier's punitive claim was barred by § 1997e(e) just as much as his compensatory claim."). Nominal damages, however, may still be recoverable. <u>Smith</u>, 502 F.3d at 1271.

  "In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than *de minimis*." <u>Mitchell v. Brown & Williamson Tobacco Corp.</u>, 294 F.3d 1309, 1312–13 (11th Cir. 2002); *see also* <u>Mann v. McNeil</u>, 360 F. App'x 31, 32 (11th Cir. 2010) (holding that § 1997e(e) barred inmate's claims for monetary damages; inmate's complaints of vague injuries to his back and scrapes and marks

on his knees and legs did not amount to more than *de minimis* physical injury); Nolin v. Isbell, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000) (bruises received during an arrest were non-actionable *de minimis* injury); Quinlan v. Personal Transp. Servs. Co., 329 F. App'x 246, 249 (11th Cir. 2009) (holding that § 1997e(e) barred pre-trial detainee's claims for compensatory and punitive damages; complaints of temporary chest pain, headache and difficulty breathing while in transport van, as well as subsequent "continuous back pain in [his] lower back that periodically cause[d] [him] to walk hunched over," did not constitute more than *de minimis* physical injury required under § 1997e(e), since none of the conditions required immediate medical attention or evidenced physical injury besides discomfort).

In Harris v. Garner, the Eleventh Circuit stated, "We therefore join the Fifth Circuit in fusing the physical injury analysis under section 1997e(e) with the framework set out by the Supreme Court in Hudson for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment, and hold that in order to satisfy section 1997e(e) the physical injury must be more than *de minimis*, but need not be significant." 197 F.3d 1279, 1286 (11th Cir. 1999), *reh'g en banc granted and opinion vacated*, 197 F.3d 1059 (11th Cir. 1999), *opinion reinstated in relevant part en banc*, 216 F.3d 970 (11th Cir. 2000). Under binding circuit precedent, this court therefore must "fus[e] the physical injury analysis under section 1997e(e) with the framework set out by the Supreme Court in Hudson for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment." *Id.*

Under this analysis, and for the reasons stated previously, the court concludes that for Eighth Amendment and summary judgment purposes, Plaintiff failed to demonstrate a genuine issue of material fact as to whether the injuries he suffered from the use of force were more than *de minimis* in nature. Consequently, the court further concludes that Plaintiff's *de minimis* injuries are likewise insufficient to permit his claims for punitive and compensatory damages to survive the bar of § 1997e(e).[14] Therefore, his claims for compensatory and punitive damages should be dismissed. The

---

[14] Plaintiff states he is suing Defendants in their individual capacities only (doc. 58 at 1). To the extent Plaintiff would seek to sue Defendants in their official capacities for damages, however, such suit would be barred by the Eleventh Amendment. *See* Miller v. King, 384 F.3d 1248 (11th Cir. 2004) (a plaintiff may not bring a § 1983 action for monetary damages against the state or state officials in their official capacities). Absent waiver or express congressional abrogation, the Eleventh Amendment prohibits a suit brought by a private individual against a state in

only other relief Plaintiff requests is a declaratory judgment and nominal damages (which are generally $1.00) (doc. 58 at 11); therefore, that is the only relief to which he may be entitled if he succeeds on his excessive force claim against Davis and Hall.

VI.   CONCLUSION

Viewing the evidence in the light most favorable to Plaintiff, the non-movant, the court finds that Defendant Gielow is entitled to summary judgment on Plaintiff's Eighth Amendment claim of deliberate indifference to Plaintiff's suicide risk. Additionally, Defendant Hall is entitled to summary judgment on Plaintiff's Eighth Amendment claim regarding the removal of Plaintiff's clothing after he exited his cell and was awaiting medical treatment. A genuine dispute of material fact exists which precludes summary judgment for Defendants Hall and Davis on Plaintiff's Eighth Amendment claim of excessive force. However, Plaintiff's claims for punitive and compensatory damages are barred by 42 U.S.C. § 1997e(e).

Accordingly, it is **ORDERED**:

1.      Plaintiff's Motion to Strike (doc. 141) is **DENIED**.

2.      Plaintiff's Motion for Sanctions (doc. 157) is **DENIED**.

And it is respectfully **RECOMMENDED**:

That the motion for summary judgment filed by Defendants (doc. 123) be **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

1.      Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's claim against Defendant Gielow;

2.      Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's claim against Defendant Hall regarding his removal of Plaintiff's clothing;

3.      Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's claims for compensatory and punitive damages;

---

federal court. *See* Federal Maritime Commission v. South Carolina State Ports Authority, 535 U.S. 743, 765–78, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002); Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); Gamble v. Florida Department of Heath and Rehabilitative Services, 779 F.2d 1509, 1511 (11th Cir. 1986). A suit against a state employee in his official capacity is deemed to be a suit against the state for Eleventh Amendment purposes. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).

Case No.:  3:11cv520/LAC/EMT

4.	Defendants' motion for summary judgment be **DENIED** as to Plaintiff's excessive force claims against Defendants Hall and Davis.

At Pensacola, Florida, this 22nd day of January 2014.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).